IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| PSN ILLINOIS, LLC, | ) |
| Plaintiff, | ) Case No. 04 C 7232 |
| v. | ) Judge Virginia M. Kendall |
| IVOCLAR VIVADENT, INC., et al., | ) |
| Defendants. | ) |

MEMORANDUM OPINION AND ORDER

PSN Illinois, LLC ("PSN") has sued Ivoclar Vivadent, Inc. ("Ivoclar") and numerous other defendants for infringement of PSN's Patent No. 4,579,530 (the "'530 Patent"). Defendant Ivoclar moves for summary judgment on the issues of non-infringement and laches separately from the other defendants. This Court ruled on October 11, 2005 that a genuine issue of material fact exists with respect to the affirmative defense of laches.[1] This opinion addresses Ivoclar's Motion for Summary Judgment on non-infringement. Because Ivoclar's product does not infringe on the '530 Patent either literally or under the doctrine of equivalents, summary judgment for Ivoclar on the issue of non-infringement is granted.

---

[1] The October 11, 2005 Opinion was drafted by another judge in this district. This case transferred to the present judge on January 23, 2006 as part of the Executive Order creating this judge's calendar. The previous judge passed to this judge all information, including the visual aids presented to the Court by the parties during their in-court demonstration of the respective techniques.

## Background

### *The '530 Patent*

The '530 Patent describes an innovation in the design and construction of porcelain tooth veneers. The original '530 Patent was filed on November 21, 1984 and issued on April 1, 1986 to Dr. Gerald G. McLaughlin ("McLaughlin"), the named inventor. It was later reexamined by the United States Patent and Trademark Office, which narrowed the scope of the claims to porcelain veneers via a reexamination certificate issued July 11, 1989. The '530 Patent expired November 21, 2004.

Rather than describe the patent in the Court's own words because the claimed terms are in dispute, the '530 Patent claims the following:

> 1. A method of fabricating a custom-made porcelain veneer restoration for a tooth without the use of a metal matrix comprising the steps of:
> a. preparing an impression of said tooth;
> b. forming from said impression a statue of said tooth out of an investment material;
> c. applying porcelain powder to the surface of said statue to build a veneer restoration conforming to the shape of the bonding surface of said tooth;
> d. firing the porcelain veneer restoration on said statue; and
> e. eroding away said statue from said porcelain veneer restoration leaving said restoration ready for mounting on said tooth.

'530 Patent, Def. Ex. 1 at col.6 ll.35-50; '530 Reexamination, Pltf. Ex. D at col 1, ll. 14-31. The specification of the '530 Patent describes the application of porcelain powder to the surface of the statue via an opaque water "slurry" containing the porcelain powder. '530 Patent, col. 4, ll. 4-12. The specification also describes bevelling, glazing, and providing other finishing treatment to the veneer while the veneer remains attached to the statue. The '530 Patent specification states that "the support provided by the statue with the casing still mounted while such treatment is conducted is a feature of this invention." '530 Patent, col. 4, ll. 44-47.

2

*The Empress Product*

Ivoclar markets and sells its trademarked Empress veneer technique ("Empress"), also known as the "Lost Wax" technique, for the creation of porcelain tooth veneers.[2] The Empress process takes an impression of the customer's teeth and makes a mold from the impression out of a hard stone material. After the mold has been created, the Empress process coats the front and sides of a molded tooth with a wax substance to make a new mold, and attaches a wax sprue, or handle, to the top of each wax mold. The wax mold of the tooth veneer is then placed into the center of a cylindrical container with the sprues attached to the base of the container. More than one tooth can be placed in the cylindrical container at the same time; for example, Ivoclar's description of its process in its own literature shows 4 wax molds in one cylindrical container at the same time.

Once the wax molds are in the cylindrical container and anchored to the base, the cylindrical container is filled with an investment material until it completely covers the wax molds and sprues. When the investment material has hardened, the container and anchoring base are removed, leaving the wax molds and wax sprues suspended in the hardened cylinder of investment material with the ends of the sprues just reaching the outer surface of the investment material. The cylinder of investment material is placed in a kiln and heated to the point that the wax molds melt away, leaving a negative mold of the tooth veneer suspended in the investment material and a passage to the exterior of the cylinder.

After the reverse mold of the tooth veneers has been created, the cylinder is placed into a plunger with the passages facing up. A solid ceramic ingot is also placed in the plunger, suspended

---

[2] The Court's brief description of the Empress process is drawn from those portions of Ivoclar's Statement of Undisputed Facts that were admitted by Plaintiff, as well as the in-court demonstration material submitted by the parties.

above the cylinder. The plunger, with cylinder and ingot in place, is placed into a press furnace. When the ceramic ingot becomes sufficiently hot it reaches a "flowable" or molten state, at which time the ingot is pressed downward by the plunger so that the flowable material moves through the passages and fills the negative molds of the tooth veneers.

Once cooled, the investment material is stripped away, revealing porcelain sprues attached to porcelain veneers. The Empress process grinds away the porcelain sprues, and then glazes, polishes, and contours each porcelain veneer, after which it can be prepared for and mounted on the customer's tooth.

*Background to Litigation*

As discussed in the October 11, 2005 opinion, during the mid 1990's the '530 Patent was held by Yukiyo, Ltd. ("Yukiyo"). McLaughlin was president of Yukiyo. In the mid-1990's, Yukiyo asserted the '530 Patent against multiple dental laboratories, but did not assert the patent against Ivoclar or the Empress product. The cases were consolidated in the Northern District of California, *In re Yukiyo Patent Lit.* The *Yukiyo* court bifurcated trial on infringement and patent invalidity. After a ruling on claim construction, the invalidity case went to trial and a jury trial upheld the '530 Patent's validity. The Federal Circuit upheld the jury verdict on validity in an interlocutory appeal, after which the defendant dental laboratories settled with Yukiyo. Both parties have used the claim construction in the *Yukiyo* court as a basis for their proposed claim constructions to this Court, and have submitted the *Yukiyo* court's claim construction order as a supporting document in this case.

After Yukiyo and McLaughlin assigned the '530 Patent to PSN, PSN asserted the patent before this Court against Ivoclar and several dental laboratories for their sale and use of the Empress product. Ivoclar moved for summary judgment that its Empress product does not infringe the '530

Patent, and that any claim against Ivoclar by PSN is barred by the affirmative defense of laches. In the October 11, 2005 opinion and order, the Court addressed solely the affirmative defense of laches and determined that a genuine issue of material fact exists as to the extent and time period of McLaughlin's knowledge of the Empress product. The October 11, 2005 Opinion did not address claim construction or summary judgment on grounds of non-infringement.

Discussion

The Court uses a two-step analysis to determine whether a patent is infringed. First, the Court construes each of the disputed claims. *Conoco, Inc. v. Energy and Environmental Int'l, L.C.*, 460 F.3d 1349, 1358 (Fed. Cir. 2006). Then, the properly construed claims are compared to the allegedly infringing product. *Id.* The parties dispute the construction of the phrases "porcelain powder," "statue" and "ready for mounting" in Claim 1 of the '530 Patent.

Claim Construction

Claim construction resolves disputed meanings in a patent to clarify and explain what the claims cover. *Terlep v. The Brinkman Corp.*, 418 F.3d 1379 (Fed. Cir. 2005). Claim construction is an issue of law for the court to decide. *Id., citing Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995). The terms of a claim are given the ordinary and customary meaning that the terms would have to a person of ordinary skill in the art at the time of the filing date of the patent application. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005). In construing claims, courts look to intrinsic evidence - the words of the claims, the specification, and the prosecution history - as well as extrinsic evidence such as expert testimony, scientific principles, and technical publications. *See Conoco*, 460 F.3d at 1362.

"Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1313. The specification of a claim is usually dispositive; "it is the single best guide to the meaning of a disputed term." *Id*. at 1315, *citing Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). While courts may rely upon extrinsic evidence of the relevant art, it is "less significant than the intrinsic record in determining the legally operative meaning of the claim language." *Phillips*, 415 F.3d at 1317, *quoting C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004).

With respect to the use of dictionaries, technical or general, the *Phillips* court addressed in detail in an *en banc* decision the relationship between definitions in dictionaries and the patent specification. The *Phillips* court acknowledged the competing lines of cases concerning the use of dictionaries in construing claims. *See Phillips*, 415 F.3d at 1319. While affirming that dictionary definitions can be used as extrinsic evidence in claim interpretation and may be helpful for courts seeking to understand the meaning of a term to one of ordinary skill in the art, the *Phillips* court made clear that substantial reliance on dictionary definitions improperly "limits the role of the specification in claim construction to serving as a check on the dictionary meaning of a claim term. . ." *Id.* at 1320. The *Phillips* court upheld the approach taken in *Vitronics* that judges may consult dictionaries and technical treatises "so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents." *Phillips*, 415 F.3d at 1322-23.

*"Porcelain Powder"*

Ivoclar asks the Court to construe the claim "porcelain powder" as "porcelain matter in a finely divided particulate state." Def. Mem. at 3. PSN, on the other hand, seeks to construe the same claim as "a medium containing porcelain particles." Defendant's Local Rule 56.1 Statement of Facts, Ex. 14 (hereafter "Def. 56.1 Ex. __"). The parties do not dispute that the '530 Patent describes applying a porcelain powder that has been mixed into an "opaque water slurry," while the Empress product uses a "ceramic ingot" that has been heated into a "flowable" state.

Ivoclar relies on several technical dictionary definitions of "powder" as "finely divided particles." *See* Def. 56.1 Exs. 15-17. Therefore, maintains Ivoclar, a hard ceramic ingot cannot be a powder. But the *Phillips* decision specifically cautions courts against using the analysis urged by Ivoclar - that is, reading the claimed term in insolation and relying upon a dictionary definition of that term that is at odds with the use of the term throughout the specification of the patent. *See Phillips*, 415 F.3d at 1321. A person of ordinary skill in the art is presumed to read the claimed term in the context of the entire patent. *Phillips*, 415 F.3d at 1313. Ivoclar maintains that only powder, and not a solid form of powder, can be a "powder" in the '530 Patent. But taking Ivoclar's proposed construction to its logical conclusion, the claimed step "applying porcelain powder to the surface of said statue" would mean that someone following the '530 Patent must apply powder, alone, to the surface of the statue to form the veneer. At no point in the '530 Patent summary, preferred embodiment, or example does the Patent describe use of the porcelain powder without a medium. To the contrary, the specification describes complimentary functions for the medium, such as adding pigment to the medium to render the porcelain opaque. *See* '530 Patent, col. 4, ll. 4-9.

The preferred embodiment and example in the '530 Patent describe applying the porcelain powder to the statue after mixing it with water. To read the term "porcelain powder" as excluding porcelain powder in a medium, as proposed by Ivoclar, would make it impossible to make the invention as described. *See Hoechst Celanese Corp. v. BP Chems. Ltd.*, 78 F.3d 1575, 1578 (Fed. Cir. 1996) ("[I]t is unlikely that an inventor would define the invention in a way that excluded the preferred embodiment, or that persons of skill in this field would read the specification in such a way.") Therefore, the Court construes the claim "porcelain powder" as proposed by PSN: a porcelain powder is a medium containing porcelain particles.

*"Statue"*

Ivoclar asks the Court to construe the claimed term "statue" consistent with the *Yukiyo* court's construction:

> Statue means the positive, substantially entire version of the tooth formed by the investment material when formed within the impression. A synonym for statue is model or die.

Def. 56.1 Ex. 13. PSN believes that the term "statue" should have a modified construction from that provided by the *Yukiyo* court:

> Statue means the positive, substantially entire version of the tooth *having at least portions of three sides of the tooth* formed by the investment material *from* the impression.

Def. 56.1 Ex. 14.

When construing a claim, "the context in which a term is used in the asserted claim can be highly instructive." *Phillips*, 415 F.3d at 1314. In claim 1 of the '530 Patent, the claim describes forming a statue "from said impression" of the tooth. '530 Patent, col. 6, ll. 40-42. It does not extend the definition to forming the statue "within the impression" as in the *Yukiyo* court's

8

construction. Although the preferred embodiment describes a statue that is "cured and removed from the mold," there is nothing in the patent specification that suggests that the creation of the statue must be limited to that method. "From the impression," as explicitly stated in Claim 1, is sufficient to define the formation of the claimed "statue."

During the course of claims construction briefing, Ivoclar amended its proposed claim construction to remove the phrase "having at least three sides of the tooth" in order to conform to the *Yukiyo* court's construction that contained no such language. PSN proposes a modified version of Ivoclar's initial proposal by defining a statue as having "at least portions of three sides of the tooth." On the basis of the '530 Patent specification and McLaughlin's statements during the prosecution history, PSN's proposed language better defines "statue" than Ivoclar's revised proposal containing no such language. As Ivoclar itself noted in its reply brief, McLaughlin distinguished the '530 Patent from prior art by noting that his patent taught a "full statue of the tooth" rather than only a single surface and that "the present invention relies upon the use of a tooth statue which inherently involves the use of three sides of the tooth." Def. 56.1 Ex. 10 at 22; Def. Reply Mem. at 6. Because Ivoclar's evidence directly supports the construction proposed by PSN and the specification of the Patent comports with the construction, the Court accepts this portion of PSN's proposed construction.

PSN disputes the use of the terms "model" and "die" as synonyms for "statue" because they may create confusion due to their other uses in the dental veneer field. Pltf. Resp. at 7. While this may be the case for the word "die," which may have other meanings to those skilled in the art and may therefore cause confusion, the synonym "model" is used both in ordinary language as a synonym for statue, and in this case has been used by the inventor himself in the specification as a synonym

9

for the claimed term "statue." *See* col. 3 ll. 45 ("A model or statue of the tooth or teeth is then produced from the mold."). "The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Nystrom v. Trex Co., Inc.,* 424 F.3d 1136, 1142 (Fed. Cir. 2005) *quoting Phillips*, 415 F.3d at 1316). Since the term model assists a reader in understanding the use of the term "statue" in the context of dental work, that term is retained from the *Yukiyo* court's construction.

"Statue" means the positive, substantially entire version of the tooth, having at least portions of three sides of the tooth, formed by the investment material from the impression. A synonym for a statue is a model.

*"Ready for Mounting"*

Finally, the parties dispute whether the phrase "ready for mounting" in claim 1 can imply any steps other than mounting the porcelain veneer onto the customer's tooth. Ivoclar initially proposed the following construction:

> A veneer is ready for mounting when the veneer restoration does not require any additional finishing subsequent to eroding away the statue in order to fit the porcelain veneer restoration to the tooth.

Def. 56.1 at ¶ 35. After PSN responded to Ivoclar's construction, Ivoclar revised its proposed construction to:

> Leaving the veneer restoration ready to be fitted to and cemented on a patient's tooth for which it was custom-made.

Def. Supp. Mem. at 3. PSN does not provide a proposed construction.

The '530 Patent summary describes performing touch-ups, smoothing, and if desired, adding a glaze after the veneer has been removed from the statue. *See* col. 2, ll. 52-60. But the preferred

embodiment section describes finishing treatments performed while the veneer is still attached to the statue, and the example section describes glazing the veneer and then re-firing the veneer prior to removing the veneer from the statue. *See* col. 4, ll. 40-47; col. 5 ll. 65 - col. 6 ll. 2. Tellingly, the preferred embodiment specifically states that "the support provided by the statue with the casing still mounted while such treatment is conducted is a feature of this invention." Col. 4, ll. 44-47.

While two parts of the patent specification may be internally inconsistent, the plain meaning of "ready for" and the specific affirmation of the statue's presence during finishing as "a feature of this invention" support Ivoclar's proposed construction. Reading the claimed term "ready for mounting" to include finishing steps after the statue has been removed effectively reads the disputed phrase out of the claim. *See, e.g. Texas Instruments, Inc. v. U.S. Int'l Trade Comm.*, 988 F.2d 1165, 1171 (Fed. Cir. 1993) (rejecting a proposed claim construction because it would "render the disputed claim language mere surplusage").

PSN also argues that the specification's references to cleaning, sterilization, etching, and adding cement to the veneer support PSN's position that the patent contemplates additional steps between removing the statue and mounting the veneer on the tooth. But these steps described by PSN are steps associated with mounting rather than finishing. *See* col. 2, ll. 57-60 (describing cleaning, etching and adding a cement coating "to permit the veneer to be mounted and fixed in place"). Therefore, "ready for mounting" means "leaving the veneer restoration ready to be fitted to and cemented on a patient's tooth for which it was custom-made."

<u>Summary Judgment of Infringement</u>

"Infringement, whether literal or under the doctrine of equivalents, is a question of fact." *Depuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, – F.3d –, 2006 WL 3346155 at *3 (Fed. Cir.

Nov. 20, 2006). Ivoclar cannot prevail on summary judgment until the undisputed evidence shows that Ivoclar has neither literally infringed the '530 Patent, nor infringed under the doctrine of equivalents. "The proper inquiry is whether the evidence is such that a reasonable jury could return a verdict for the non-movant." *Cook Biotech, Inc. v. Acell, Inc.*, 460 F.3d 1365, 1373 (Fed. Cir. 2006). In reviewing a motion for summary judgment, the court makes all justifiable inferences in favor of the non-movant. *Id.*

Ivoclar has literally infringed the patent if its product contains embodies each of the claimed elements and limitations. *Kraft Foods, Inc. v. Int'l Trading Co.*, 203 F.3d 1362, 1370 (Fed. Cir. 2000). Thus, given the issues presented by the parties to the Court and given the Court's construction, Ivoclar's Empress product will not literally infringe unless it: 1) uses a porcelain powder, 2) uses a statue, and 3) is ready for mounting when the statue is removed.

Under the doctrine of equivalents, "a product or process that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention." *Depuy*, 2006 WL 3346155 at *6. Infringement under the doctrine of equivalents has been defined in two primary ways: the "triple-identity test," which examines if the accused process: 1) performs the same function as the patented process; 2) operates in substantially the same manner; and 3) achieves substantially the same result; or the "insubstantial differences" test. *See Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 39-40 (1997). Determinations of infringement under the doctrine of equivalents are limited by two legal doctrines, prosecution history estoppel and the "all elements rule," each of which are questions of law. *See Depuy*, 2006 WL 3346155 at *3. The "all elements" rule requires that a court apply the doctrine of equivalents to each

individual element of a claim, rather than to the invention as a whole, in order to "balance the doctrine of equivalents with the basic patent law principle that claim language defines the scope of an invention and every limitation is material." *Id.* at *7.

Looking at each disputed claim in turn, the undisputed evidence reveals that Ivoclar's product does not infringe the '530 Patent, either literally or under the doctrine of equivalents. There exists a genuine issue of material fact as to whether the Empress product employs a porcelain powder, literally or in its equivalent. While Ivoclar does not use a literal "statue" as defined in the '530 Patent, the Empress negative mold survives summary judgment under the doctrine of equivalents. But the Empress product is not "ready for mounting" either literally or under a theory of equivalence, so summary judgment on non-infringement must be granted.

*Porcelain Powder*

There exists a genuine issue of material fact as to whether the ceramic ingot used by Empress literally infringes the claimed use of "porcelain powder." PSN presents testimony that the ceramic ingot has substantially identical chemical composition to porcelain dental powder. PSN has also produced the instruction manual for the Empress system, which describes the material as "leucite-reinforced glass-ceramic" where the "semi-finish product in powder form is then pressed into ingots and fired." Pltf. 56.1 Ex. P. Finally, PSN argues that the ceramic ingot is in a "molten" form at the time that it is pressed into the investment material, and is therefore in the same, or at least a similar, medium to the "slurry" that is applied in the '530 Patent.

Ivoclar, on the other hand, has produced evidence that the ceramic ingot undergoes a chemical change during the process, and cannot be returned to a porcelain powder state. Ivoclar compares the relationships between "porcelain powder" and the ceramic ingot to the relationship

13

between sand and glass, and argues that the chemical transformation makes the ceramic ingot not a "powder" even under the construction determined by this Court. Whether the ceramic ingot is a powder is a genuine issue of material fact determinative of infringement, and cannot be decided on summary judgment.

*Statue*

There is no disputed fact that could lead a reasonable jury to conclude that Ivoclar uses a literal "statue." A statue is a *positive model* of the patient's tooth. The patented process takes an impression, or negative mold, of the patient's tooth using a gummy substance. From that negative mold, the patented process forms a positive model of the patient's tooth. The rest of the patented process continues using that same positive model, while the Empress process uses that positive mold to make negative model out of investment material. That negative model is not a statue, and is not used as the statue is used in the patented process. The Empress product does not literally infringe upon the element of the claimed process that employs the "statue."

But under the doctrine of equivalents, a reasonably jury could conclude that the combination of the initial model and the negative investment mold used in the Empress product are the equivalent of the '530 Patent statue. The doctrine of equivalents recognizes that "the language in the patent claims may not capture every nuance of the invention or describe with complete precision the range of its novelty." *Depuy*, 2006 WL 3346155 at *6, *quoting Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.,* 535 U.S. 722, 731 (2002). A reasonable jury could decide that the cylinder made of investment material, containing a negative space for the exact shape of the tooth veneer, is a mirror-image or inverse of the statue employed in the '530 Patent. By creating a mold from the impression of the patient's tooth, and then using extra steps to create a negative mold, the Empress

14

product could be interpreted to use an equivalent, mirror image, to the claimed "statue" for purposes of applying the porcelain. In this sense, while not conforming to the literal element of the '530 Patent claim, a reasonable jury could conclude that the hard stone mold plus the investment cylinder perform the same function, in the same way, with the same end result as does the '530 Patent statue.

*Ready for Mounting*

Summary judgment for Ivoclar on both literal and equivalent infringement is appropriate because no disputed fact that could lead a reasonable jury to conclude that the Empress veneer is "ready for mounting" when removed from the investment material. Under the construction of the claim determined in this Opinion, a veneer is "ready for mounting" when it is "ready to be fitted on and cemented to a patient's tooth." There is no dispute that the Empress veneer requires substantial finishing work after it is removed from the cylinder of investment material and before it is fitted and cemented to the patient's tooth. The Empress veneer requires that the porcelain sprue be removed from the veneer, and that the veneer be stained, glazed, and contoured, a process that involves re-firing the veneer casing.

Use of doctrine of equivalents can be precluded as a matter of law. "Under the particular facts of a case, . . . if a theory of equivalence would entirely vitiate a particular claim element, partial or complete judgment should be rendered by the court*.*" *Depuy*, 2006 WL 3346155 at *7, *quoting Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 39 n.8 (1997). In the case of the tooth veneer, the specification stresses the importance of the presence of the statue during the finishing process. The parties do not dispute that the Empress process strips away the investment material prior to the commencement of the shaping, finishing, and glazing of the veneer. *See* Def.

15

56.1 Facts at ¶ 44h.³  Considering the Empress process and the '530 Patent process equivalent renders the claim element "eroding away said statue from said porcelain veneer restoration leaving said restoration ready for mounting" meaningless.  Put another way, while the Empress process may achieve the same result - a finished veneer - it does not do so in the same manner, and the investment material in the Empress process does not perform the same function as the "statue" in the '530 Patent.   Under these facts, no reasonable jury could conclude that the Empress product is "ready for mounting" when the investment material is removed.

Conclusion

Having construed the disputed claims, the Ivoclar Empress product does not infringe upon the '530 Patent because the phrase "ready for mounting" cannot be so expanded to cover the process employed by Ivoclar.  Ivoclar's Motion for Summary judgment on the issue of non-infringement is granted.

So ordered.

_____
Virginia M. Kendall, United States District Judge
Northern District of Illinois

Date: December 7, 2006

---

³ Curiously, both parties rely upon Ivoclar's "Instructions for Use" in support of their arguments.  *See* Def. 56.1 Ex. 11.  The diagrams in the Instructions show the Empress casing being set atop a die for finishing after the investment material has been removed, and possibly lightly cemented to the die.  *See* Def. 56.1 Ex. 11 at "Contouring the Pressed Object/Finishing."  Both parties devoted substantial briefing to the construction of the phrase "ready for mounting" but do not mention the possible re-employment of the original mold.  The Court does not consider issues not raised by the parties, and therefore considers waived the potential use of a supporting mold during the Empress finishing process.